# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PAUL PARSHALL, On Behalf of Himself and All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) Case No. _____ |
| v. | ) ) CLASS ACTION |
| ZELTIQ AESTHETICS, INC., MARK J. FOLEY. D. KEITH GROSSMAN. DAVID J. ENDICOTT. MARY M. FISHER. KEVIN C. O'BOYLE. ANDREW N. SCHIFF, ALLERGAN PLC, ALLERGAN HOLDCO US, INC., and BLIZZARD MERGER SUB, INC., | ) ) DEMAND FOR JURY TRIAL ) ) ) ) ) ) |
| Defendants. | ) |

**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff, by and through his attorneys, alleges upon personal knowledge as to himself, and upon information and belief based upon, among other things, the investigation of counsel as to all other allegations herein, as follows:

**SUMMARY OF THE ACTION**

1. This is a class action brought on behalf of the public stockholders of ZELTIQ Aesthetics, Inc. ("ZELTIQ" or the "Company") against ZELTIQ and its Board of Directors (the "Board" or the "Individual Defendants"), to enjoin a proposed transaction announced on February 13, 2017 (the "Proposed Transaction"), pursuant to which ZELTIQ will be acquired by Allergan plc and its affiliates.

2. On February 13, 2017, the Board caused ZELTIQ to enter into an agreement and plan of merger (the "Merger Agreement") with Allergan Holdco US, Inc. ("Parent") and Blizzard Merger Sub. Inc. ("Merger Sub," and together with Parent and Allergan plc, "Allergan"). Pursuant to the terms of the Merger Agreement, Allergan will acquire ZELTIQ,

and stockholders of ZELTIQ will receive $56.50 per share in cash.

3. On March 9, 2017, defendants filed a Preliminary Proxy Statement (the "Proxy Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4. The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading. Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6. This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of ZELTIQ common stock.

9. Defendant ZELTIQ is a Delaware corporation and maintains its principal executive offices at 4410 Rosewood Drive, Pleasanton, CA 94588. ZELTIQ's common stock is

traded on the NasdaqGS under the ticker symbol "ZLTQ."

10. Defendant Mark J. Foley ("Foley") has served as a director of ZELTIQ since 2009, as President and Chief Executive Officer ("CEO") since August 2012, and as Chairman of the Board since February 2016.

11. Defendant D. Keith Grossman ("Grossman") has served as a director of ZELTIQ since October 2013. According to the Company's website, Grossman is a member of the Audit Committee and Chair of the Nominating and Governance Committee.

12. Defendant David J. Endicott ("Endicott") has served as a director of ZELTIQ since April 2016. According to the Company's website, Endicott is a member of the Compensation Committee.

13. Defendant Mary M. Fisher ("Fisher") has served as a director of ZELTIQ since September 2012. According to the Company's website, Fisher is a member of the Audit and Compensation Committees.

14. Defendant Kevin C. O'Boyle ("O'Boyle") has served as a director of ZELTIQ since July 2011. According to the Company's website, O'Boyle is Chair of the Audit Committee and a member of the Nominating and Governance Committee.

15. Defendant Andrew N. Schiff ("Schiff") has served as a director of ZELTIQ since July 2010. According to the Company's website, Schiff is Chair of the Compensation Committee.

16. The defendants identified in paragraphs 10 through 15 are collectively referred to herein as the "Individual Defendants."

17. Defendant Allergan plc is a global biopharmaceutical company with its corporate headquarters located in Dublin, Ireland.

18. Defendant Parent is a Delaware corporation and a wholly-owned subsidiary of Allergan plc.

19. Defendant Merger Sub is a Delaware corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

**CLASS ACTION ALLEGATIONS**

20. Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of ZELTIQ (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

21. This action is properly maintainable as a class action.

22. The Class is so numerous that joinder of all members is impracticable. As of February 10, 2017, there were approximately 40,214,029 shares of ZELTIQ common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

23. Questions of law and fact are common to the Class, including, among others, whether defendants violated the 1934 Act and whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

24. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

25. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible

standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

26. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

*Background of the Company and the Proposed Transaction*

27. ZELTIQ is a medical technology company focused on developing and commercializing products utilizing its proprietary controlled-cooling technology platform.

28. The Company's first commercial product, the CoolSculpting® System, is designed to selectively reduce fat bulges that may not respond to diet or exercise. CoolSculpting is based on the scientific principle that fat cells are more sensitive to cold than the overlying skin and surrounding tissues. CoolSculpting utilizes precisely controlled cooling to reduce the temperature of fat cells in the treated area, which is intended to cause fat cell elimination through a natural biological process known as apoptosis. The Company developed CoolSculpting to safely, noticeably, and measurably reduce the fat layer within a treated fat bulge without requiring the patient to diet or exercise. ZELTIQ has received regulatory clearance from the U.S. Food and Drug Administration ("FDA") to market CoolSculpting in the United States for the selective reduction of fat around the flanks and the abdomen area. ZELTIQ has also received regulatory approval or is otherwise free to market CoolSculpting in 55 international markets.

29. On November 9, 2016, ZELTIQ issued a press release wherein it reported its

financial results for the third quarter of 2016. The Company reported revenue of $95.2 million, up 55% year-over-year. ZELTIQ also reported international revenue of $20.9 million, up 43% year-over-year. With respect to the results, Individual Defendant Foley, Chairman, CEO, and President of the Company, commented:

> I am extremely pleased with our third quarter performance as we delivered the largest revenue quarter in the Company's history during what is typically a seasonally slower time of year in the aesthetics industry. We experienced strong growth in both systems and consumables as the durable benefit of our direct-to-consumer or DTC campaign continued to create momentum and further solidify CoolSculpting® as the leading non-invasive, fat-reduction brand. With North America account utilization up 25% year-over-year, and over six million unique visitors to our website during the first nine months of the year, we continue to have conviction in our DTC investments and believe that we are not only generating awareness but are also beginning to condition a broader consumer base for treatment. Our international business also performed exceptionally well with revenues up 43% year-over-year as our new international management team continued to successfully execute and as we commenced our launch into the China Medical market. Importantly, the third quarter also demonstrated our ability to deliver significant profitability, as evidenced by our record Adjusted EBITDA margin, as we realized the benefit of our strategic investments.
>
> Overall, I am very pleased with our broad-based success in the quarter and believe that it added strong validation to our DTC strategy, international investments, and ability to deliver profitable growth. Due to our strong momentum in the market, we are increasing our full year 2016 revenue guidance to a range of $350 million to $352 million.

30.     On March 1, 2017, ZELTIQ issued a press release wherein it reported its fourth quarter and full year 2016 financial results. The Company reported fourth quarter revenue of $105.1 million, up 34% year-over-year, as well as full year revenue of $354.2 million, up 39% year-over-year. ZELTIQ also reported consumable revenue growth of 54% in the fourth quarter and 57% for the full year. With respect to the financial results, Individual Defendant Foley commented:

> We are incredibly pleased to announce another year of record revenue performance, with full-year revenue growth of 39% and fourth quarter revenue surpassing the $100 million mark for the first time in the Company's history.

> Additionally, we delivered strong profitability with Q4 net income of $10.3 million, or 9.8% of revenue, and adjusted EBITDA of $23.1 million, or 21.9% of revenue, highlighting the leverage in our business model. Our strong fourth quarter results were driven by a company record 186 new account openings in North America, consumable revenue growth of 54%, continued momentum internationally, and the ongoing successful introduction of our innovative new applicators, CoolAdvantage® and CoolAdvantage+®, which have already been adopted in approximately 50% of our North American account base. Our direct to consumer advertising program continues to exceed our expectations by delivering greater than a dollar of return for each dollar spent while continuing to raise consumer awareness and drive new patients into the aesthetic channel. We continue to be very pleased with the consumable revenue growth and utilization lift this nationwide program has delivered.

31. Nevertheless, the Board caused the Company to enter into the Merger Agreement, pursuant to which the Company will be acquired for inadequate consideration.

32. To the detriment of the Company's stockholders, the terms of the Merger Agreement substantially favor Allergan and are calculated to unreasonably dissuade potential suitors from making competing offers.

33. The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals. Section 4.3(b) of the Merger Agreement states:

> (b) Except as permitted by this Section 4.3, during the Pre-Closing Period the Company and its Subsidiaries shall not, and the Company shall direct and use its reasonable best efforts to cause its and its Subsidiaries' directors, officers and employees and its Representatives not to, (i) continue any solicitation, knowing encouragement, discussions or negotiations with any Persons that may be ongoing with respect to an Acquisition Proposal or (ii) directly or indirectly, (A) solicit, initiate or knowingly facilitate or encourage (including by way of furnishing non-public information) any inquiries regarding, or the making of any proposal or offer that constitutes, or could reasonably be expected to lead to, an Acquisition Proposal, (B) engage in, continue or otherwise participate in any discussions or

negotiations regarding, or furnish to any other Person any non-public information in connection with or for the purpose of knowingly encouraging or facilitating, an Acquisition Proposal or any proposal or offer that could reasonably be expected to lead to an Acquisition Proposal, (C) enter into any letter of intent, acquisition agreement, agreement in principle or similar agreement with respect to an Acquisition Proposal or any proposal or offer that could reasonably be expected to lead to an Acquisition Proposal or (D) resolve or agree to do any of the foregoing. The Company shall, and shall cause its Subsidiaries and shall direct and use its reasonable best efforts to cause its and its Subsidiaries' directors, officers and employees and its other Representatives to, immediately cease and cause to be terminated any solicitation, encouragement, discussion or negotiation with any Person or groups that may be ongoing with respect to any Acquisition Proposal or potential Acquisition Proposal and immediately terminate access by any such Person or group to any physical or electronic data rooms relating to a potential Acquisition Proposal. The Company shall promptly after the date hereof request each Person (if any) that has received information from the Company during the past two years pursuant to a confidentiality agreement (other than the Confidentiality Agreement) relating to an Acquisition Proposal or potential Acquisition Proposal to promptly return to the Company or destroy all non-public documents and materials relating to the Acquisition Proposal or to the Company or its Subsidiaries or its or their businesses, operations or affairs heretofore furnished by the Company, its Subsidiaries or any of its or their Representatives to such Person or group or any of its representatives in accordance with the terms of such confidentiality agreement, and shall not waive, terminate or modify without Parent's prior written consent, any standstill or similar provision in any confidentiality, standstill or other agreement with such Person, except that the Company hereby waives any "don't ask" or similar provision in any confidentiality agreement that could preclude a Person from seeking a waiver; provided that the Company may waive any standstill or similar provisions to the extent necessary to permit a Person or group to make, on a confidential basis to the Company's Board of Directors, an Acquisition Proposal, conditioned upon such Person agreeing to disclosure of such Acquisition Proposal to Parent, in each case as contemplated by this Section 4.3 (provided, further, that the Company may only take such action if the Company's Board of Directors determines in good faith (after consultation with outside legal counsel) that the failure of the Company's Board of Directors to take such action would be inconsistent with its fiduciary duties under applicable Law).

34. Further, the Company must promptly advise Allergan of any proposals or inquiries received from other parties. Section 4.3(d) of the Merger Agreement states:

(d) Following the date of this Agreement, the Company shall promptly (and in any event within 36 hours) (i) notify Parent if any inquiries, proposals or offers with respect to an Acquisition Proposal are received by the Company or any of its Representatives, (ii) provide to Parent the identity of the Person making such

inquiry, proposal, offer or request, and a copy of the material written materials related thereto (or, if oral, a written summary of the material terms and conditions of such inquiry, proposal, offer or request), (iii) keep Parent reasonably informed of any material developments, discussions or negotiations regarding any Acquisition Proposal, including by providing prompt (and in any event within 36 hours) notice of all material amendments or modifications thereto and all material written materials subsequently provided in connection therewith, and (iv) upon the request of Parent, inform Parent of the status of such Acquisition Proposal.

35. Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Allergan a "matching right" with respect to any "Superior Proposal" made to the Company. Section 5.1(b) of the Merger Agreement provides, in relevant part:

> (b) Notwithstanding anything to the contrary contained in this Agreement, at any time prior to the Company Stockholder Approval being obtained:
>
> (i) if the Company has received a bona fide written Acquisition Proposal (which Acquisition Proposal did not arise out of a breach of Section 4.3) from any Person that has not been withdrawn and after consultation with outside legal counsel and financial advisors, the Company's Board of Directors shall have determined, in good faith, that such Acquisition Proposal is a Superior Offer, (x) the Company's Board of Directors may make a Company Adverse Change Recommendation, or (y) the Company may terminate this Agreement to enter into a Specified Agreement with respect to such Superior Offer, if and only if: (A) the Company's Board of Directors determines in good faith, after consultation with the Company's outside legal counsel, that the failure to do so would reasonably constitute a breach of the fiduciary duties of the Board of Directors of the Company to the Company's stockholders under applicable Legal Requirements; (B) the Company shall have given Parent prior written notice of its intention to consider making a Company Adverse Change Recommendation or terminate this Agreement pursuant to Section 7.1(f) at least four (4) business days prior to making any such Company Adverse Change Recommendation or termination (a "Determination Notice") (which notice shall not constitute a Company Adverse Change Recommendation); and (C) (1) the Company shall have provided to Parent a summary of the material terms and conditions of the Acquisition Proposal and copies of all material written materials related thereto in accordance with Section 4.3(d), (2) the Company shall have given Parent the four (4) business days after the Determination Notice to propose revisions to the terms of this Agreement or make another proposal so that such Acquisition Proposal would cease to constitute a Superior Offer, and shall have negotiated in good faith with

Parent with respect to such proposed revisions or other proposal, if any, and (3) after considering the results of such negotiations and giving effect to the proposals made by Parent, if any, after consultation with outside legal counsel and financial advisors, the Company's Board of Directors shall have determined, in good faith, that such Acquisition Proposal is a Superior Offer and that the failure to make the Company Adverse Change Recommendation or terminate this Agreement pursuant to Section 7.1(f) would reasonably constitute a breach of fiduciary duties of the Board of Directors of the Company to the Company's stockholders under applicable Legal Requirements. Issuance of any "stop, look and listen" communication by or on behalf of the Company pursuant to Rule 14d-9(f) shall not be considered a Company Adverse Change Recommendation and shall not require the giving of a Determination Notice or compliance with the procedures set forth in this Section 5.1. For the avoidance of doubt, the provisions of this Section 5.1(b)(i) shall also apply to any material amendment to any Acquisition Proposal and require a new Determination Notice, except that the references to four (4) business days shall be deemed to be three (3) business days.

36. Further locking up control of the Company in favor of Allergan, the Merger Agreement provides for a "termination fee" of $74 million, payable by the Company to Allergan if the Individual Defendants cause the Company to terminate the Merger Agreement.

37. By agreeing to the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

38. The consideration to be paid to plaintiff and the Class in the Proposed Transaction is inadequate because, among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

39. The merger consideration further fails to adequately compensate the Company's shareholders for the significant synergies that will result from the merger.

40. Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

41. Meanwhile, certain of the Company's officers and directors stand to receive substantial benefits as a result of the Proposed Transaction.

42. For example, it appears that ZELTIQ's management team will retain employment positions post-close. As reported in a *The Street* article titled "Allergan Shares Rise on $2.5B Deal for Body-Sculptor Zeltiq," Brent Saunders ("Saunders"), CEO of Allergan, informed investors on a February 13, 2017 conference call that "he suspects the vast majority of the Zeltiq team, led by medical device veteran and CEO Mark Foley, will join Allergan post-transaction."

43. Additionally, Individual Defendant Foley stands to receive $14,721,737 in connection with the Proposed Transaction, and three of the Company's other named executive officers stand to receive $18,609,879.

*The Proxy Statement Omits Material Information, Rendering It False and Misleading*

44. Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction.

45. The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.

46. First, the Proxy Statement omits material information regarding potential conflicts of interest of the Company's officers and directors.

47. During a February 13, 2017 conference call regarding the Proposed Transaction, Saunders informed investors that "he suspects the vast majority of the Zeltiq team, led by medical device veteran and CEO Mark Foley, will join Allergan post-transaction."

48. However, the Proxy Statement fails to disclose the timing and nature of all communications regarding the future employment of Individual Defendant Foley and his management team, as well as the future directorship of ZELTIQ's directors, including who

participated in all such communications.

49. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

50. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Reasons for the Merger"; and (iii) "Interests of Our Directors and Executive Officers in the Merger," including, but not limited to, the following phrase: "no other employment, equity contribution or other agreement, arrangement or understanding between any executive officer or director of ZELTIQ, on the one hand, and Allergan or its affiliates, on the other hand, existed as of the date of this proxy statement."

51. Second, the Solicitation Statement omits material information regarding potential conflicts of interest of the Company's financial advisor, Guggenheim Securities, LLC ("Guggenheim Securities").

52. While the Proxy Statement discloses that "Guggenheim Securities acted as financial advisor to an affiliate of Allergan US in connection with its recent acquisition of LifeCell Corporation, for which Guggenheim Securities received agreed upon fees," and "Guggenheim Securities acted as financial advisor to AqueSys, Inc. in connection with its acquisition by an affiliate of Allergan US in 2015, for which Guggenheim Securities also received agreed upon fees," the Proxy Statement fails to disclose the amount of compensation received by Guggenheim Securities in connection with such services.

53. Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

54. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Reasons for the Merger"; and (iii) "Opinion of ZELTIQ's Financial Advisor."

55. Third, the Proxy Statement omits material information regarding the Company's financial projections.

56. Specifically, the Proxy Statement fails to provide a reconciliation of all non-GAAP to GAAP financial metrics.

57. When a company discloses information in proxy materials that includes non-GAAP financial metrics, the company must also disclose comparable GAAP metrics and a quantitative reconciliation of the non-GAAP metrics to GAAP metrics.

58. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Reasons for the Merger"; and (iii) "Certain Financial Forecasts Utilized by ZELTIQ in Connection with the Merger."

59. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to ZELTIQ's stockholders.

## COUNT I

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and ZELTIQ**

60. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

61.     The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.  ZELTIQ is liable as the issuer of these statements.

62.     The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

63.     The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

64.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

65.     The Proxy Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

66.     By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

67.     Because of the false and misleading statements in the Proxy Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and Allergan

68. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

69. The Individual Defendants and Allergan acted as controlling persons of ZELTIQ within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of ZELTIQ and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

70. Each of the Individual Defendants and Allergan was provided with or had unlimited access to copies of the Proxy Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

71. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly in the making of the Proxy Statement.

72. Allergan also had direct supervisory control over the composition of the Proxy Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy Statement.

73. By virtue of the foregoing, the Individual Defendants and Allergan violated Section 20(a) of the 1934 Act.

74. As set forth above, the Individual Defendants and Allergan had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B. In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Directing the Individual Defendants to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E. Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: March 14, 2017                      **RIGRODSKY & LONG, P.A.**

                                                 By:    */s/ Brian D. Long*
                                                           Seth D. Rigrodsky (#3147)
                                                           Brian D. Long (#4347)
                                                           Gina M. Serra (#5387)
                                                           2 Righter Parkway, Suite 120
                                                            Wilmington, DE 19803

**OF COUNSEL:**                            Tel.: (302) 295-5310
                                                           Facsimile: (302) 654-7530

**RM LAW, P.C.**                           Email: sdr@rl-legal.com
Richard A. Maniskas                      Email: bdl@rl-legal.com
1055 Westlakes Drive, Suite 3112     Email: gms@rl-legal.com
Berwyn, PA 19312
Tel.: (484) 324-6800                        *Attorneys for Plaintiff*